The next argument is in Appeal 16-01 from 2008, Everett Labs v. Breckenridge. Mr. Durante, good morning to you. Welcome to the Court. Please proceed. Good morning, Your Honor. May it please the Court. The sole issue before the Court today is whether the District Court used its discretion in granting Everett Laboratories a plenary injunction based on errors of law. That's a very high standard, isn't it? Use of discretion. That means it's their call, and we only overturn it if it's a real use of something that's their call. Do you still think that happened? I do, Your Honor. Did you finish your sentence by saying based on an error of law? Based both on errors of law and clearly erroneous factual findings. Well, let's start with errors of law. What precisely was the error of law? Well, as an initial matter, the District Court imposed a higher burden on Breckenridge than was appropriate at the plenary injunction stage. The District Court said that it did not deem it prudent to second-guess the findings of the Patent Office after what it called affirmative and definitive evidence contradicting the findings of the Patent Office. And by definition, definitive means fully developed and exhaustive. That's commensurate with the clear and convincing standard that's appropriate at trial, not at the plenary injunction stage. And it's important to note, by the way, that the District Court didn't just say that in passing. It said that at the point in which it reached its conclusion that Breckenridge had not established. Tell me again, the error is exactly what? Pardon me, Your Honor? The error is precisely in what? It's the imposition of an incorrect evidentiary standard at the plenary injunction stage. Which was? Because. Which was? Which was affirmative and definitive evidence. Well, I thought you were equating that with clear and convincing evidence. I think it's. You're saying that that's wrong because this is pretrial. That's right. I think affirmative and definitive is certainly much closer to clear and convincing that's appropriate at trial. Okay, so if we read the language Judge Linares used as meaning or equating with clear and convincing, why is that an error? Well, because at the plenary injunction stage, the standard is much lower. Well, what's your basis of that? Well, there's precedent from this Court, including the Errico v. Boutek case. You're saying that the standard is much lower than clear and convincing? Indeed, it's one of vulnerability. The challenger near only showed that the patents, a serious challenge to the validity of patents, and the patents are vulnerable on the issue of invalidity. Vulnerability is going to be measured by clear and convincing evidence. So I don't understand how you think that disappears from the equation. Because in some opinions, we talk about substantial question, we talk about vulnerability, we talk about any number of other articulations. It doesn't change the – the only place it can be found invalid on summary judgment or at trial is if the challenger meets the clear and convincing standard. I would agree, Your Honor, that that is the standard at trial. How can it be different at any other stage? Because at the preliminary injunction stage, you do not have a fully developed record. This particular motion was brought under order to show cause. There was not time to develop a record, and the precedents of this Court recognize – But this judge is trying to predict the likelihood that they're going to be able to show that. Why isn't it appropriate for him to rely to some degree on the presumption of validity to take into account the standards that the Chief Judge is talking about? I think the presumption of validity is entitled to some deference, but importantly here, and this was my second point, the district court incorrectly concluded that the prior art relied on by Breckinridge at the preliminary injunction stage was, in fact, before the Patent Office. The real question here is you have three pieces of prior art which weren't before the Patent Office, and, of course, the presumption of validity has to be taken into account. The question is whether these three pieces of prior art that were not before the Patent Office raise a substantial question of patentability. That's the issue, you know, and these three pieces of prior art show the same ingredients with the exception of one. What's different is that the district court said there's a different range for the calcium, right? That's absolutely correct. Well, you've got to combine the three. You've got to pick and choose, too, don't you? Yeah. You do have to combine the three. There's no question about that. You've got to pick a certain thing from here and a certain thing from there and a certain thing from here. I don't think it's quite that dramatic because if you look at the… It's right in front of me. You're picking A is from the prenatal, D is from the… that's all of them. C is from the talons, and the next one, E, is from Vitafol. I could go on down, but you've got to flip back and forth every time, don't you? Well, with respect to the Vitafol, that's ever its own prior product. That contained eight of the 15 in identical amounts. So then what are you left to look at? You're left to look at the two prior art products that have the same exact 15 vitamins and minerals. Well, the point is it's going to be an obvious mistake. Yes. And so that kicks us pretty quick into whether or not there's a secondary consideration, and you've got flat out copy. The district court did notice, did note that there was copy in this case. Why doesn't the secondary consideration, again, help the district judge show that there's not a likelihood that they're going to prove by the clear and convincing evidence standard? Obviously. Because copying in and of itself is not sufficient to cover the day on that issue. The precedents of this court have recognized that where there's a substantial invalidity defense presented by the challenger, and there's a lack of substantial showing on other secondary conditions. But the FDA doesn't regulate vitamins, does it? The FDA? No, they do not. So they didn't catch the copy. Yes. Companies that are multi-source or generics do catch the copy. Why is copying an important indication that this was a particularly inventive or attractive combination? Because copying had nothing to do with the inventive aspect of the product allegedly made under the patent. Rather, what we have here is, just as you just said, Your Honor, the opportunity for a multi-source, a generic company to provide a low-cost alternative to a branded product. And that's all that's done here. It doesn't provide any credence at all to the novelty or non-obviousness of the product made under the patent. I'm having a hard time translating what you're really saying in the legal term. Usually, you say copying is acceptable evidence of so-called objective considerations and can weigh against the finding of obviousness. But you seem to be saying, no, copying gets zero weight. It's irrelevant. That's a little hard for me to follow. I didn't quite say that, Your Honor. What I'm saying is that it's given very, very little weight under the precedence of this court, including the recent Frisket case, which says that you need to consider all the evidence as a whole, and if there's a substantial... Well, of course. There's no doubt that you have to consider all the evidence on both sides of the scale. That's beyond argument. But I thought you were saying that copying counts for zero in the grand analysis. No, I did not quite say that. I'm saying that... How close to that are you? What I'm saying here is... I'm just trying to understand what your position is. I appreciate that. What I'm saying here is that secondary considerations are part of the analysis, and the district court found that there was insufficient evidence to establish commercial success. The district court did look at copying, did find there was evidence of copying. But the case law of this court says that when you look at the secondary considerations and the consideration of copying, you give it little weight if there aren't other indicia, secondary indicia of non-obviousness. And that's particularly the case here, where any purpose of copying is merely to provide a lower-cost alternative to a branded product. Well, the cost has nothing to do with the analysis. Obviousness has nothing to do with the price of the one product versus the other. That's a question of prior art, not which is cheaper. I like cheaper drugs, too, but they really have nothing to do with the analysis. No, but what it has to do is, again, with how much weight the copying factor is given as part of the secondary considerations. And where there's a strong showing here of non-obviousness on the merits, combined with a lack of a convincing showing on other secondary indicia of non-obviousness, that's sufficient to give copying very, very little weight in the overall context of the analysis. You may have just spoken. I thought your position was that there was strong evidence of obviousness, not non-obviousness. I may have just spoken. I apologize. Isn't this your only argument to get around copying? It is by our law and secondary consideration, and your only argument is we did it on purpose. No, I think our primary argument is that the invention is obvious in view of the prior art. And the prior art is, as we've already spoken about, products that are virtually identical in terms of their composition. Well, what if they want to make the precise combination from three separate prior art vitamins that you made, other than that you wanted to copy an attractive product? The motivation is in the prior art itself. These three products have virtually the same composition, but defy common sense. The point is, if you're inventing a new vitamin, and you're going to take D, vitamin D, why would you choose the 70 instead of the 120 or the 60? What causes you to choose exactly the right one? Well, there's no... To make precisely the combination that they made. I think your only answer is because we wanted to copy them, because they were an attractive product, and we wanted to cut into their market. But again, that team sends to support their combination, not substantiate your point that it's something that one of skill in the art would have done. They would have made that choice of metallums rather than Vitafol or Prenate for some inventive reason. Right. The only reason you're doing is to copy. Well, that has to do with the commercial aspect of the product. We have to think of it from the other angle. We have to go before the invention is made and say, why would one of skill in the art choose the exact combination that they chose? The claim of invention is now off the table. Why would they make that strange group of combinations? What suggests to them to do that? What is the motivation to do it? It can even be just a suggestion to do it. Okay. The answer to that is twofold. One is that, as I've said, these products are virtually identical in terms of the 15 vitamins and minerals. If these three products are not the same. But the amount is different. The claim is to a precise formulation, not just a list of particular vitamins. Right. And that would be my second point, and that is that it was well known in the art, and the other patents acknowledged this, that optimizing specific nutrients was well known and well within the skill of people in the art. But they each, there was three pieces of prior art. They each optimized something different. And then along comes the invention with a precise combination. I think you have to admit that the only reason you made the combination is a copy of that, which suggests the inventiveness, not the motivation to make that combination. You don't have any evidence of motivation to make that combination, do you? Well, as I said, the motivation exists in the fact that it was well known within the skill of the art to specifically optimize the amounts of these various nutrients. And each piece of prior art had optimized something different, hadn't they? So that you would think somebody making a fourth combination would probably come up with something entirely different than exactly what they claimed. If there are differences, those differences don't necessarily impart... The reason you did it is to copy the product. Well, that's what generics and multi-source competitors do. They copy the product. Finally. Can we save the rest of your rebuttal time? Thank you. Thank you, Mr. Lorenzo. Okay, Mr. Goldberg. Where's the irreparable harm here? I had a very hard time following the finding of irreparable harm. Very hard. Certainly, Mr. Lorenzo. Let me address that. I'm Roy Goldberg on behalf of the Appellee Everett Laboratories. The irreparable harm is from the nature of this market. Well, that doesn't help me if you're going to testify about the dynamics of this market. We have a very thin record here, as I understand it, consisting solely of a short declaration by the company's CEO. And he simply asserts that there'll be lost market share that can't be recovered and that, therefore, damages don't suffice. But I have any idea whether that's true, sometimes true, never true, partly true, totally true. I can't tell anything from his affidavit. It's a naked conclusion, it looks like to me. Where am I wrong? With all due respect, let me try to flesh this out a little bit here. We have the declaration such as it is. There was no effort to depose this person. There was no testimony or evidence on the other side that could have tried to do that. I understand that. So it stands unrebutted, and it stands for what it says. But what does it really say? Well, and there's something else that's very important, Your Honor, that it's in Appendix 133 to 134. It's a statement by Breckenridge, and it's briefed to the district court. And it says, By default, OD is only one of a number of prescription vitamin and mineral compositions that compete in the market. So before Judge Linares was the undisputed fact by both sides that the market consisted of more than just phytophthalose B and the copycat product. How does that help you? It looks like that weakens your case. Because it shows why we have irreparable harm, Your Honor. There is no way. I'm not following you at all. So far, I don't have an ounce of irreparable harm here. Let me try to explain, Your Honor. My client, Everett Labs, is faced with this situation. If they were to go market, talk to the doctors, do whatever they need to do, they were going to build up, multi-fold, a competitor because of the computer system with the insurance databases was going to automatically fill the prescription. Okay. So what happens? If they don't market, they don't just lose the sales to multi-fold. They lose the sales to the other products that are in the market. And that became an affidavit saying that, right? This is lawyer argument. You don't have an affidavit. We submitted an affidavit that says that we are selling this product in the market, that we're worried about these automatic substitutions that will happen. Let's do it this way. Show us what line in the CEO's affidavit makes your point. We can't let you testify about how the market works. Either what he said is sufficient or what he said isn't sufficient. Before I get to his affidavit, I just want to emphasize the point I made from Breckenridge. That line is – that stipulated fact shows that the market consists of these other products. And that is a critical component of Breckenridge. I don't care if it consists of 100 products. That doesn't – have your affidavit say something it doesn't say. Or the declaration. I would point at the declaration to the – Where are you at? And the copy I have right in front of me is under the JA site. There's paragraph 14. What page? It's page 5. My offering is copy – You're on page 5. I'm sorry. The declaration of Don J. Johnson. One moment, let me get that. Page 109 of the Joint Appendix. First of all, Mr. Giordano talks about paragraph 14. He talks about the fact that by offering the copy product as an unlawful generic version of the patented product, Breckenridge is competing unfairly against Breckenridge and his Biafalt OB supplement. The issue is why money damages won't make you whole. And your CEO seems to say because we'll lose market share. That doesn't prove you can't be made whole. But Judge Linares made a reasonable inference from the facts presented, which is that there will also be loss of market share to the other competitors in the market. So what? That cannot be repaired. Why not? Because it's too speculative. It's too speculative to know what sales might have been lost to some other nutritional supplement with a different formulation. There's no reference in here to loss of sales to other nutritional supplements, is there? The argument was made – Is there? It's an inference that Judge Linares made based on the evidence before him, which included not only the declaration of Mr. Giordano, which we think went most of the way, but also the undisputed fact by both sides there were other competitors in the market. So Judge Linares made a reasonable inference that that would be a situation. But even beyond that, other things were clearly in the record. Mr. Giordano in his declaration, if you would go to pages 112 and 113 of his declaration, talk about how a multifold would get a foothold in the marketplace by the time this matter proceeds to trial. Physicians and pharmacists learn that Breckenridge has deceived them into prescribing and providing an unlawful generic version. The realities of the marketplace would make it impossible for Everett to overcome the misinformation campaign launched by Breckenridge. This is what I don't understand. He talks about the reality that's on the market, but what reality? What is he talking about? The fact that the doctors and their patients have been misled. See, the doctors will prescribe what they have been led to believe is an important and an efficacious nutritional supplement that we're talking about nursing and lactating mothers and pregnant mothers and fetuses- Misled about what? I'm sorry? Misled about what? About the fact that multifold is the same as- I thought the allegation was that it was the same, that they copied it. It's the same as far as the 15 minerals and vitamins in the agreement. It wouldn't be the same as to, and this point was made to the district judge, as to what the non-active ingredients would be, as to the manufacturing process might be. There's no quality control that's there. How do we know any of this? How do we know there's no quality control? We don't have any evidence about quality control or lack of quality control, do we? There is evidence in the record here that it's not a true generic of Mr. Giordano's declaration because it is not bioequivalent. That's in his declaration, and that was some of the concern that was in the declaration when it was submitted to the district court, that there's a concern that it's an alter ego issue, that market will perceive them as the same because they don't know. How does that hurt your sales if their product is not an adequate substitute? How does that hurt your sales? Well, it's being substituted automatically by the plant basis, so the sales are hurt. We don't make the sales. What does this line, irrevocably harm the goodwill mean? There's multiple facets of that, but included within that is the fact that the marketplace will get used to multifold as opposed to the bioequivalent. As a district judge, how do you think to understand what goodwill is? Can you intuit how that goodwill can be harmed by an infringing product? The evidence was before the judge to make that determination. Look, if it was evidence in front of the judge that the infringing product was ineffective or dangerous or had some ingredients in it that made it act too slowly or reduced absorption or something, then I can follow the logic of why you would be hurt, but we don't have any such evidence. But that would put us in a very difficult position because we needed to move immediately, and we did. We found this product was out there, and to say that we should wait a few months to see whether we find out if any women and fetuses are being hurt by this, not only would that be a bad situation. You don't have to wait until somebody's hurt. You can call an expert witness who says, this copycat product doesn't work as well because blah, blah, blah. The formulation doesn't work as well or there are contaminants in it or whatever. You don't have to wait until somebody gets sick. But it was an unknown at the time, and immediately when they started, when we found out they were selling it, we filed a complaint, and then we moved for the injunction. It is a known thing, and I believe it is in this declaration, that it's not a bioequivalent. So in other words, we only know what they claim to have on their products. But you're speculating that it might injure your goodwill. There's no proof that it would, right? In the business world, it's more than speculation. It's a serious concern based on the experience of the declarant, the president of the company, that he is very concerned that you have this alter ego out there that does not have this. It has the same elements that are active ingredients, but it doesn't necessarily have the non-active ingredients that are the same. And it doesn't have the manufacturing. Well, why would that matter? Because there's no control over the quality. There's no control. It's being marketed as the same thing, but it's not the same thing. Yeah, but if the differences are immaterial, then you aren't going to lose any goodwill. If the differences are huge, you would lose goodwill, but then we have zero proof of what the differences amount to. It's the unknown. It's a false advertising plan rather than a patent on the name. It's a concern that they will be identified in the market. It's just like if it was a generic toilet paper. So it is a false advertising plan rather than a patent on it. Well, there is an unfair competition plan, but that's not why we didn't get a rupture in harm. The rupture in harm is based on the fact that as long as that product is in the market, that effort will be harmed financially, but also in financial ways that they cannot get the lost profits for, and also with respect to the entire line. In other words, they market to build up this innovative product, and by default has a name that they are trying to market, and by having the patent-infringing product multipole, that's also a lost opportunity. Let me also address this way. I want to ask a question about the issue of audiences. What I'm troubled about is there's nothing in this act, and no suggestion in this record, that your product with the different ranges is an improvement over the prior product. There's no evidence of that, no suggestion of that. So under those circumstances, I'm wondering, how is it that in order to claim non-obviousness, you can say, well, we have different ranges? Do you understand what I'm saying? Yes, I do. And here's how I look at that issue. The range cases are very informative for purposes of whether there's a prima facie case of obviousness. We would submit we don't need to win by persuading your honors to agree with the PTO and judge on ours, that there was no prima facie case of obviousness, but we do submit the fact there was no prima facie case. And the range cases and the range of- You're not addressing my question. My question is there's nothing in this act, nothing in this record to suggest that these particular ranges were beneficial. How can you say that our product is non-obvious because it has different ranges, identical vitamins and minerals? Two of the prior items are exactly the same except for the ranges. How can you rely on the ranges to distinguish yourself over the prior? You haven't claimed any benefit to the particular ranges that are included in this act. Because there was no legal obligation for us to make that claim at any stage of the process. Had the patent examiner- So we can assume that there's no benefit from these particular ranges. No, there isn't very much a benefit. And there's even record of the evidence this took over a year to develop, and obviously the inventors were looking at ways to improve- I thought it was conceded that there was no evidence of a benefit to these particular ranges. There was no evidence presented to the PTO because we didn't need to present evidence to the PTO because the PTO didn't deny- There's nothing in the patent that says there's a benefit to these particular ranges over the prior. There's nothing in the patent that says there's a benefit. Obviously, the specification- That's correct, right? There's nothing in the patent. The patent talks about the need to determine the right minerals and vitamins in the right quantities. But effectiveness is an FDA question, isn't it? Not a PTO. That is true. There's no business plan. So the PTO is not going to ask you what's more effective or less effective. And you don't have to have an improvement patent. You can get a patent for something that's less good than the prior art, as long as it's not obvious over the prior art. Precisely. We had no obligation to put this in front of the PTO. I'm just saying that had the PTO examiners said, we think this is- What I'm trying to say is there's nothing in the patent that suggests that this is an improvement over the prior art, right? If that's a legal conclusion, I'd have to disagree. I'm not sure what it is in the patent. There's no business plan in the patent. If there's something in the patent, just quote it to us. If there's something somewhere in the spec that shows that the particular range of calcium or whatever is an improvement, just show us what column, what line. Throughout the specification, each of the critical minerals and vitamins is talked about. And we could go through- There's no question that there are benefits to the particular minerals and vitamins. You can compare it to a placebo. But there's no suggestion in here that this particular combination in these particular maps is an improvement over the prior art, is there? Well, they don't refer to Vitafolpidin. They don't refer to the particular prior art references relied upon by Breckenridge and make a comparison. That is true. They do not do that. I guess the reverse of that is there's nothing about the prior art that shows, in the language of KSR, any apparent reason to have the inventors decide. Under KSR, you can't satisfy the TSM. There's no reason to have these particular ranges. How can you ever show that there's a suggestion or motivation to make a combination that's reflected in the patent? Well, there is very much a reason to pick what the inventors pick because they have to balance the various quantities. For example, you would want a certain, perhaps less amount of calcium if you're going to increase zinc for purposes of toxicity. There's a reason for having vitamin A. But that's what you're saying. That's not in the patent, right? Well, the patent specifies- Well, certainly they were interested in optimizing and making the well-being of the newborn child. But that doesn't provide an apparent reason as to why a particular amount was chosen as opposed to another. But if you go into the patent, in the specification, again, each one of the various items is discussed. And there's a discussion. I can't remember whether this has a discussion as to the vitamin A. I know that the vitamin A was decreased because there was a concern of toxicity because of vitamin A. And that was one of the reasons that we wouldn't like that in the patent. If you show them, you have to be interested. I'm just not- I don't believe under the law there was a requirement to put in the specification why each particular vitamin or mineral was selected. At the end of the day- Maybe not. The question was, is it in there or not? Not was it required to be in there, but is it in there? Again, I'm not aware, to answer your question, that they went through each particular vitamin and mineral and came up with a quantity and said why that quantity is being used as opposed to another quantity. I have a weird feeling that you're wrong. I also want to return, though, to the point that we did discuss, but on irreparable harm, of a presumption that would apply here. Obviously, it's still an open issue in light of eBay, but we think that the evidence- That's what I was going to say. We do think we made a strong show on the issue of obviousness, and therefore, there should be less of a threshold requirement for irreparable harm. We think irreparable harm is clear here, but with all respect, we think the showing on obviousness was very clear for many of the reasons that we heard from your honors this morning. We think that this was a case where we weren't trying to force anybody out of the market except for people who had the exact, precise 15 minerals and vitamins in exact, precise amounts. It doesn't stop people from being in the market. This wasn't used affirmatively against some type of these prior products that were in the market, and that they, for no apparent reason- First of all, no pre-efficient case because the ranges did not overlap. Second of all, no apparent reason whatsoever to select these. This is so different than all these other cases where you have just one or two possibilities. Here we have numerous parameters to try, to use some of the language I think from the Pfizer case. Here we have lots of different things that could have been chosen here, so we do think it's a very strong case on obviousness. And then we get to the secondary consideration of copying, which we would agree with the comments from the panel this morning. We've given you several extra minutes. Thank you, Your Honor. Thank you. Thank you. Just quickly to address some of the points that were raised. With respect to benefits associated with the ranges that are claimed in this patent, the district court asked Everett a precise question at the hearing on the preliminary injunction, and Everett's counsel was forced to concede that there is or was no evidence presented to the patent office or to the district court to show that there were any benefits associated with these particular claims ranges over those in the prior art. With respect to irreparable harm, the issue of quality control, that was an issue that was raised for the first time in oral argument at the district court, and the district court judge rejected those arguments because they were raised for the first time in oral argument and gave them no weight, so I'm not going to spend any more time on that today. With respect to the position that Everett cannot get lost profits, well, Mr. Giordano, the decorate, calculated what their lost profits would be by virtue of the sale of Breckenridge's profits, so it's hard for me to see how that would be the case. He didn't say they couldn't get lost profits. He said it wouldn't make them whole. That was a different thing. Well, okay, with all due respect, I wrote that down. Once you lose market share and goodwill, how do you compensate for that? Market share, did you say? And goodwill. With respect to market share, it's clear, given the evidence of record, that there's head-to-head competition, one-for-one correspondence between the product made under the patent and the product that's accused of infringement. That's Everett's evidence. That's the evidence that's before the court. So for every sale of Multifold Plus, there's a corresponding lost sale of Vitafol OB. So any market share that's acquired from Multifold Plus is market share taken away, presumably, from Vitafol OB. It's a direct one-to-one correspondence. But once you forfeit share, market share, you lose the ability to recover that in the future. It runs indefinitely into the future, which is not compensable, of course. All your damages are always looking back. Well, I think that if, at the end of the day, the decision of the district court were that the patents were- What about the goodwill? The goodwill has really no objective evidence of record to establish any loss of goodwill. The argument made by counsel- But when we say the district court abused its discretion when it had unrebutted evidence of market share and goodwill being lost, that the Federal Circuit has, in several instances, found that to be irreparable harm. Well, in these particular circumstances, the evidence was so specific that any loss in market share could be readily calculated and compensable- Used its discretion. The district court, yes, indeed. In the balance of weighing all the factors under irreparable harm, did it use its discretion. I think we've got your case clearly in mind and also the case of the other side. We'll take the appeal on your advice and we thank both counsel for it. All rise. The Honorable Court is adjourned from day to day. Thank you. Thank you. Thank you. Thank you. Thank you. Wasn't it? No. Okay. Okay. Thank you. How do you figure out antitrust? If you really get into the depths of antitrust, you don't have an expert trying to tell you how to do it, you actually have to figure it out. Read the whole case. All the points. It's a real place. Well, I'm going to leave you now. If you want to do some food, we enjoyed having you on today.